**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FIONA FENG CHEN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  03 C 3928** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **NORTHWESTERN UNIVERSITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Before this Court is defendant Northwestern University's ("Defendant" or "Northwestern") motion for summary judgment against plaintiff Fiona Feng Chen ("Plaintiff" or "Chen"). For the reasons set forth below, defendant's motion is granted.

## I.    FACTS

In the spring of 1999, plaintiff Fiona Feng Chen interviewed for an accounting assistant position in Northwestern University's Office of Clinical Research and Training ("OCRT").[1] The

_____

[1] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 Statements of Undisputed Facts. Chen's Local Rule 56.1(b) response to Defendant's Statement of Undisputed Facts and her Statement of Additional Facts both contained numerous violations of the requirements of the local rule. In addition, Chen submitted exhibits that fall outside the scope of acceptable materials in support of summary judgment briefs. For example, Chen filed a four-volume document entitled "Appendix to Plaintiff's LR 56.1 Statement of Additional Facts in Support of Its Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Memorandum in Objection to Defendant's Motion for Summary Judgment and Plaintiff's Response to Defendant's 56.1 Statement of Uncontested Facts." In all, plaintiff has submitted somewhere in the range of 2,000 pages of paper in this case. Many of these submissions fall just inside or beyond the outer ranges of what is permissible under Rule 56. Fed. R. Civ. P. 56. This volume of paper represents a burden on the court and the defendant; and the

OCRT runs clinical studies for Northwestern University clinical investigators, some of whom conduct research for pharmaceutical companies; OCRT administers budget for such studies. Chen was not hired for the accounting assistant position. Chen was 44 years old at that time. Chen is of Chinese and Southeast Asian descent and was born and raised in Taiwan.[2] Chen has a Ph.D. in Public Administration from SUNY-Albany, specializing in Policy Analysis and Organization Management.

In August 1999, Chen interviewed with OCRT again. She met with Sheri Lindsay, an Associate Director at OCRT; Dr. Thomas Schnitzer, Director of OCRT; and Val Campbell of Northwestern University Human Resources. Chen was hired into a position created especially for her, Technical Software Specialist, in September 1999. Chen was employed as a Technical Software Specialist from September 1999 until the position was eliminated in November 2001.

---

questionable relevance of many of the documents filed is vexatious. However, in keeping with the standard of making all reasonable inferences in favor of the non-moving party on summary judgment review, this Court will not use its time considering whether or not an individual document should be struck from the record but will instead decide this case on the merits. To the extent that Chen relies on an unauthenticated document, such as notes she created about her medical history or computer complaints, that document will be disregarded. Potentially self-serving documents with no authentication or documents based on events or conversation of which the creator has no personal knowledge are improper evidence. There is no effect on the outcome of the summary judgment decision.

[2] Chen, who is representing herself *pro se* in this matter, filed two sets of responses to Defendant's motion for summary judgment. This Court informed her that it would not consider multiple filings. Chen accordingly stated that she would rely on the second filing. Defendant filed a Motion to Strike for significant violations of Local Rule 56.1. That motion remains pending and will be considered separately. Chen then sought leave to file an amended set of response pleadings in an attempt to cure the alleged Local Rule 56.1 deficiencies. This Court granted that leave. Defendant did not seek leave to file a sur-reply. As a result, defendant's reply brief responds to a filing that is no longer properly before this Court. As plaintiff's amended filings sought to cure what were largely procedural defects, the substance of the amended brief does not differ from that of the filing it superseded. Defendant's reply brief, therefore, remains responsive.

When she began working at OCRT, Chen reported to the OCRT Business Manager, Carol J. Nielson.[3] Chen reported to Nielsen until May 24, 2001, when she also began to report to Sheri Lindsay. Both Carol Nielsen and Sheri Lindsay reported directly to Dr. Schnitzer. Chen was assigned to a workstation in an open, hallway work area on the fifth floor of the OCRT offices, close to Nielsen and Lindsay's offices. One other employee, an accounting assistant who reported to Nielsen, worked in the workstation next to Chen's. After she began work, Chen asked to be moved to an office or to some other private workspace. The parties dispute whether there were vacant offices available on the fifth floor when Chen made these requests. Apparently, an office on the fifth floor was temporarily empty on two occasions when the position of Research Financial Analyst was vacant. There were no other offices on the fifth floor that were vacant at any point during Chen's employment in OCRT.

**Technical Software Specialist Position**

The Technical Software Specialist position involved substantial computer work. Chen's initial job description prepared by the University provided that at least 30% of the Technical Software Specialist duties and responsibilities would involve computer database work, and another 30% would involve providing technical assistance to OCRT staff. The position's job description assigned duties including the design, implementation, and maintenance of various databases; creation of materials and publications to promote OCRT within Northwestern University; provision of technical assistance and support to OCRT staff; and coordination of financial activities to enhance departmental reporting, all of which was largely done on the

---

[3] The parties dispute the exact title of Carol J. Nielsen's position. Her exact title is irrelevant to the outcome of this motion.

computer. During her first year in the Technical Software Specialist position, Chen worked as many as 6-8 hours per day on the computer for periods of up to two-and-a-half months at a time.

**Chen's Reclassification Requests**

The Technical Software Specialist ("TSS") position was classified as non-exempt and grade 12 on the University's grading scale. Northwestern permits an employee, an employee's supervisor, and the department of human resources to request position reclassification. However, reclassification requests normally come from the employee's supervisor. In September 1999, shortly after Chen took the TSS position, Chen and Val Campbell, a Human Resources Consultant with Northwestern, discussed the possibility of reclassifying Chen's position as "exempt" and increasing Chen's salary. The TSS position was not reclassified. Chen renewed her reclassification request to Matthew Bowers, a Consultant in Northwestern's Human Resources Department, in May 2001.[4] The Human Resources department discussed Chen's request at a regularly-scheduled personnel issues meeting, and again determined that Chen's position was properly classified and made no changes.

In July 2001, Chen asked Rita Winters, Director of Human Resources on Northwestern's Chicago campus, about reclassification and a pay raise. Winters asked Karen McGuire, Northwestern's Director of Compensation, to conduct another review of the position to determine whether reclassification was appropriate. McGuire only conducted five or six

---

[4]Chen disputes this statement in her L.R. 56.1 Response. A review of the pages from her own affidavit that she cites in support of her opposition to this statement, however, supports the defendant's position. Chen's affidavit states, "When I was given another new job description on May 24, 2001, I though that was a good opportunity to request for a job and pay reclassification. I sent memos and supporting documentation to Matthew Bowers, our consultant at HR at that time." Chen Aff. at 18-19.

reclassification requests for positions moving from non-exempt to exempt during her three years as Director of Compensation.[5] As part of her review, McGuire interviewed Chen for 45-60 minutes in August 2001. McGuire also visited OCRT to review Chen's job duties and met with Sheri Lindsay and Chen about those duties. In addition, McGuire gathered information about fourteen similar positions at Northwestern and prepared a chart listing each position, its grade level, its exempt or non-exempt status, and the salary level assigned. She compared Chen's position and grade level to these other positions, and determined that Chen's position was properly classified. The TSS position therefore continued to be a non-exempt, Grade 12 position.

### Chen's Initial Performance at OCRT

During her first year at Northwestern, Chen generally performed well. In her first performance review, which occurred in June 2000, Nielsen rated Chen's performance as a "4" out of a possible "5." Chen received a 5% pay raise in her first year at Northwestern.

Chen's supervisors noted in Spring 2000 that Chen had some communication problems and counseled her to improve her communication. On March 22, 2000, Chen sent an email to Nielsen and to Lea Elder, the Associate Director of Clinical Research at OCRT, in which she complained of inadequate communication from them, stating that "managers carry certain

---

[5] Chen disputes this characterization of McGuire's deposition testimony, arguing that McGuire admitted to performing "probably between 30 to 50 reclassifications" from non-exempt to exempt during her *entire* time at Northwestern. According to Plaintiff, McGuire performed all but five or six of these reclassification reviews in the time period of 1994 to 1999, when she was a Senior Compensation Analyst (1994-1997) and a Manager of Staffing and Employee Development (1997-1999). Chen's objection to Defendant's statement of fact is technically true. The "clarification" tends to support Defendant's position over Plaintiff's, however, because it shows that it was more unusual than not for the Director of Compensation to perform a review, rather than one of her subordinates. Such fine-grained quibbling occurs throughout Plaintiff's 56.1 filing. To the extent that Plaintiff's dispute of Defendant's other facts is similarly unhelpful, it will be disregarded.

responsibility, too, you know." Chen closed the email by stating, "I think it is your responsibility to communicate to your subordinates what you are doing. If you fail to do so, take the responsibility for the consequences, and do not blame your subordinate ... Take your own responsibilities, please." Nielsen considered Chen's statements in the March 22, 2000 email regarding managers to be "inappropriate" and testified in her deposition that she informally counseled Chen about them. Chen denies such counseling occurred.

**Chen's Medical Condition**

In August 2000, Chen reported to Nielsen that her arm and wrist hurt from using her computer, keyboard, and mouse. Chen applied for worker's compensation benefits in August 2000 for a reported injury to her hands. Chen received various worker's compensation benefits between August and November 2000 while several physicians evaluated her medical condition. Chen contends that Northwestern "shopped" for physician's opinions and forced her to come to work when she was unable to do so. In September 2000, Chen informed Nielsen that she was unable to perform any task that required her to use her hands repeatedly, including answering the phone, photocopying, filing, and using writing utensils.

Between August and November 2000, Nielsen modified Chen's work assignments because of Chen's reported inability to perform certain tasks with her hands. During this time period, Chen was intermittently on leave, performed modified job duties, and worked less than eight-hour days. Chen alleges that she was not allowed to work less than eight hour days unless she used sick and annual leave, but acknowledges that there were times she did not attend work for a full eight hours. Chen was not required to perform any computer-related tasks from August 2, 2000 through November 2000. Instead, she attempted to perform other tasks, including doing

close-outs; doing spreadsheets by hand; reviewing amendments for budget changes; reviewing access books; going through study binders and completing a checklist to ensure that all items were present; and preparing regulatory binders for regulatory close-outs. Occasionally, Chen's condition prevented her from performing the modified duties assigned, and Northwestern had difficulty finding any tasks that she could perform. Chen reported that she was experiencing pain doing non-computer work in November 2000. When she was at work between August and November 2000, Chen occasionally took breaks at her desk, put her head down, and rested. Nielsen counseled Chen not to sleep at her desk. On November 16, 2000, Reynold André, the Claims Manager for Northwestern's Office of Risk Management, wrote Chen a letter informing her that her workers' compensation benefits for her bilateral hand pain had been terminated. Chen returned to full-time work status in November 2000.

Northwestern did not require Chen to do any computer work between August 2000 and April 26, 2001; Chen estimates that she did zero hours of computer work per day during that time frame. In late April 2001, before Northwestern required Chen to resume work duties requiring substantial use of a computer and keyboard, Northwestern provided Chen with an ergonomic keyboard. Chen had requested the ergonomic keyboard and a trackball mouse on several occasions prior to April 2001.

**Chen's Accommodation Requests**

In December 2000 and January 2001, Chen began requesting work accommodations other than relief from computer work, including a transfer to other positions with secretarial support, or a secretary for her current position. On December 20, 2000, Chen sent a letter to Matthew Bowers, in which she wrote, "Under ADA, to facilitate the University to accommodate

my disability, I am attaching a copy of my vita for your reference. Some secretarial assistance would be helpful." In addition, Chen submitted applications for two positions in January 2001; one was Associate Director of Academic Programs–CE (Continuing Education); and the other was Associate Director of Academic Programs–CE (Continuing Studies). Both positions required substantial administrative and teaching experience; the positions were responsible for planning, managing and evaluating an academic program plan for university-level credit. Northwestern reviewed Chen's transfer applications, but she was not selected for either position. Matthew Bowers, Northwestern University Human Resources Consultant, stated that Chen did not possess the requisite administrative experience. Chen disputes this fact and asserts that her educational and employment history met the requirements of the job posting.

On January 23, 2001, Northwestern held a meeting to discuss Chen's accommodation requests. Present at that meeting were Chen; Rita Winters; Carol Nielsen; Melissa Durst (Human Resources); Michael Powell, Director of Equal Employment Opportunity, Affirmative Action and Labor Relations at Northwestern University; and Anne McNicholl, Operations Consultant, Office of the Vice President of Research, Northwestern University. During the meeting, Chen stated that the ADA was inapplicable to her situation and requested that Northwestern not apply the ADA to her.

On January 24, 2001, Chen wrote a letter to Powell in which she cited a decision from the United States District Court of the Northern District of California, holding that an employee's surgically-corrected carpal tunnel syndrome was not a 'disability' within the meaning of the ADA. She then wrote, "[t]herefore, I am not disabled within the meaning of the ADA." Powell determined that the ADA did not apply to Chen because she was not "otherwise qualified" to

perform the essential duties of her position, with or without a reasonable accommodation. Chen replied and denied that she had requested any ADA accommodation. In subsequent memos, Chen referred to the ADA as "inapplicable." Although Northwestern and Chen agreed that the ADA did not apply to her situation, Northwestern attempted to find non-computer tasks for Chen to do in order to allow her hands and wrists to improve. Chen never contacted Powell to seek any further accommodation after the January 23, 2001 meeting.

In mid-December 2000, Chen's doctor prescribed that Chen should begin working six hours per day with a twenty minute break every hour, and with no computer keyboard work, effective January 7, 2001. In mid-February, Chen's doctor updated her prescription, stating that she should continue working six hours per day and could begin using an ergonomic keyboard and trackball mouse for thirty minutes per day. At the beginning of March 2001, Chen's doctor prescribed an increase in work hours to eight hours per day with a twenty minute break every hour. On May 8, 2001, Chen's doctor increased her computer keyboard time to two hours per day.

By April 2001, however, OCRT was running out of modified non-computer work for Chen to perform. The computer-related duties of the TSS position that Chen normally would have been assigned were not being completed. In May 2001, Nielsen and Schnitzer consulted with Bowers and determined that they could no longer allow Chen not to perform the computer-related tasks essential to her position. On May 9, 2001, Schnitzer and Nielsen met with Chen and informed her that she would need to perform all of the tasks related to her job, including computer-related tasks, no matter how much time on the computer those tasks required. They further informed her that if she could not fulfill her position duties, she should contact Human

Resources to determine her options. However, Northwestern allowed Chen to take twenty minute breaks during May 2001 while waiting for Chen to apply for leave time under the Family and Medical Leave Act to cover her breaks and frequent doctors' visits. Chen resumed the complete duties of her TSS position in May 2001. She estimated that she worked on her computer for an average of six to eight hours every day between May and November 2001.

Chen did not seek a transfer to another position between May and November 2001. Chen never applied for the Financial Research Analyst position at OCRT.

**Chen's Performance and Discipline**

Shortly after resuming her complete job duties on May 9, 2001, Chen engaged in a series of communications with her managers and co-workers that her supervisors considered inappropriate. On May 9, 2001, Chen sent an email to Nielsen that said, "I have a 'stupid' question. If you know how to do [a database task], why don't you just do it yourself?" The following day, Chen sent an email to Lea Elder, in which she raised concerns about her work situation and stated that her assignment to clean data in a database was not her responsibility. Bowers and Winters, from Northwestern's HR department, consulted with Nielsen and Schnitzer and helped draft a written reprimand on May 24, 2001, regarding Chen's inappropriate and unprofessional communications. Nielsen and Schnitzer met with Chen on May 24, 2001, to discuss the reprimand.

Chen sent a written complaint to Winters in late May 2001 regarding the May 24, reprimand. Winters investigated the complaint by interviewing Chen and several OCRT employees involved in the underlying situation. Winters concluded that Chen had been treated fairly; she sent Chen a memorandum reporting her findings on July 9, 2001.

Chen received her annual performance review on June 27, 2001. She received an overall performance rating of "3" out of "5," which meant that she was "meet[ing] expectations." The review noted Chen's strengths, but also highlighted areas that needed improvement, including interpersonal communication, team-building skills, and interpretation of conversation and written information. Chen received a 3.5% pay raise in 2001.

In July 2001, Lindsay, in consultation with Matthew Bowers of HR, wrote Chen a formal disciplinary memo for inappropriate conduct involving a supervisor and for excessive and redundant use of email. On July 3, 2001, Chen asked Lindsay for a change in one of her work assignments. When Lindsay refused, Chen begged her to change the assignment and, eventually, knelt on the floor of Lindsay's office and begged again. Lindsay demanded that Chen stand up and informed her that such conduct was unprofessional. Chen stated that kneeling was a way of demonstrating sincerity in certain Asian cultures; Lindsay responded that although she understood Chen's explanation, in American culture kneeling was inappropriate.

**Elimination of Chen's Position**

In mid-2001, Northwestern decided to move OCRT from reporting to the university's Vice President of Research to the Medical School. In late October, Dr. Robert Rosa, the Executive Associate Dean for Clinical Affairs at the Medical School wrote to Schnitzer, OCRT's director, instructing him "to decrease the projected expenses of the OCRT ... by approximately $200,000." Rosa explained that the decrease was required based on projected revenue estimates for OCRT. During Fall 2001, Schnitzer met with Bowers to discuss personnel reductions in OCRT in light of the budgetary constraint. Schnitzer and his management team decided to eliminate three support-staff positions that did not provide services directly to principal clinical

investigators, including the Technical Software Specialist position. Chen asserts that Bowers directed members of the OCRT management to update the Program Assistant 1 position description, adding additional computer and mail preparation duties that required use of an employee's hands and wrists.

In November 2001, Lindsay consulted with Bowers on letters to Chen and another employee, informing them that their positions were being eliminated for budgetary reasons. The other employee was a 27-year-old, non-disabled, African-American woman. The employee in the third position had already decided to leave the university when her position was eliminated; she was simply not replaced. Northwestern has a "bumping rights" policy, under which a displaced senior employee may displace a lower-graded employee within the same unit. Northwestern offered Chen to opportunity to "bump" a Program Assistant 1 employee in OCRT, a position that required a substantial amount of computer work. The Program Assistant 1 position was a lower pay-grade, but Northwestern offered to continue paying Chen at her former pay grade. Chen responded on November 19, 2001, by accepting the position on the condition that Northwestern allow her to limit her computer work to no more than three hours per day and permit her to follow other restrictions noted by her doctors. Lindsay consulted with the Human Resources department, which determined that computer work beyond three hours per day was an essential component of the Program Assistant 1 position. On November 27, 2001, Lindsay prepared a letter to Chen, explaining that Chen's work restrictions prevented her from performing the essential functions of the Program Assistant 1 position and that she was, therefore, terminated, effective November 29, 2001. OCRT has not had a Technical Software Specialist position since that time.

Between December 2001 and May 2002, Chen applied for five different open positions at Northwestern. Each application was processed according to Northwestern's practice, and Chen was not selected for any of the positions. None of the positions that Chen applied for during this time was in OCRT, and none of Chen's former supervisors in OCRT had any involvement in the hiring decisions for the positions.

**Chen's Computer and Mouse**

During her first year at OCRT, Chen complained to Nielsen that her computer was slow, that it crashed frequently, and that her mouse did not work very well. Chen requested a new computer and new mouse during the first year of her employment. Other employees had computer malfunctions in this time. An information technology employee for Northwestern inspected Chen's computer and determined that it was sufficient for the tasks she was asked to perform. The information technology employee inspected Chen's mouse, which Chen had complained was malfunctioning, and cleaned it in 1999. Chen thought her mouse still did not work properly and bought her own mouse.

On March 10, 2001, Chen submitted a letter to Michael Powell, Northwestern's Director of Equal Employment Opportunity, Affirmative Action and Labor Relations. The letter referred Powell to a February 13, 2001 prescription from Chen's doctor for an ergonomic keyboard and trackball mouse due to her carpal tunnel syndrome. Chen asserts that she had first requested the ergonomic keyboard and trackball mouse in February. Northwestern contends Chen was not performing any computer work at that time. Northwestern purchased an ergonomic keyboard and delivered it to Chen in late April 2001 when Chen began performing computer work again. Northwestern did not ask Chen to resume substantial keyboard work until May 9, 2001.

### Alleged "Young Lady" Comments

During Chen's employment in OCRT, Lindsay referred to Chen as a "young lady" on approximately three occasions. Chen informed Lindsay that she found the "young lady" comment offensive. According to information provided to Chen by Northwestern, Chen was the third oldest member of OCRT during her employment there. Lindsay was nine years younger than Chen. In a conversation with Lindsay about Chen, Schnitzer directed Lindsay not to refer to Chen as "young lady," if Chen found it offensive.

### The Research Financial Analyst Position

Between September 1999 and March 2002, the Research Financial Analyst position at OCRT became available three different times. It was available in February 2000, January 2001, and March 2002. On each occasion, the position was posted on Northwestern's job posting system and made available for other employees or potential employees to apply for. Chen never applied for the Research Financial Analyst position.

### Chen's Memo Regarding Other Discriminatory or Harassing Acts Against Chen

Chen sent an eight-page memo with multiple attachments, dated August 12, 2001, to Guy Miller, Vice President of Human Resources, and Thomas Schnitzer, Director of OCRT, with a subject line that read, "OCRT & HR Discrimination and Harassment vs. My Alternatives." Copies of the memo were also sent to Matthew Bowers, Melissa Durst, Sheri Lindsay, Karen McGuire, Carol J. Nielsen, Michael A. Powell, and Rita Winters. In this memo, Chen states that she "came to realize I have been discriminated and harassed by OCRT, HR and thus, the University, because of my race, Asian, Chinese American, born abroad, age, over 40, and disability, Carpal Tunnel Syndrome." She goes on the describe the experiences and incidents that

led her to this realization, as outlined below, including Lindsay's "young lady" comments, Chen's workstation location, and her carpal tunnel syndrome and worker's compensation issues.

Chen states that Lindsay introduced her to a group of visitors to OCRT by saying, "Fiona does whatever we tell her to do." Lindsay also would walk out of her office to throw trash in Chen's trash can on occasion.

In February 2000, Chen reports that Nielsen directed her to write emails as formal memoranda because English is Chen's second language. On August 3, 2000, after learning that Chen reported a work-related injury to Northwestern, Nielsen expressed concern about the Risk Management office's response instead of asking how Chen was doing. On September 6, 2000, Chen returned to work, although she was still injured. Chen states that Nielsen's first comments to her, while Nielsen ate a container of yogurt as breakfast, were that if Chen could not do her work, she would need to contact HR to discuss her alternatives.

In December 2000, Chen states Bowers told her that if she did not apply for FMLA leave, that Northwestern could cut her position to half time or terminate it entirely. She states that Melissa Durst, also of HR, told her on January 22, 2001, that if Northwestern found it an undue hardship to accommodate Chen's injury, that would call for termination.

Chen states that OCRT and Northwestern HR repeatedly told her that she needed to request Family and Medical Leave Act ("FMLA") time to cover her doctors' appointments and prescribed daily breaks. Chen states that she applied for FMLA leave three times during nine months, but that HR did not regard her as qualified because she had a work-related injury. Northwestern notes that on two occasions, Chen did not properly complete the FMLA application paperwork and thus, her application could not be processed.

**Other Asian-Pacific Employees**

*Principal Investigators at OCRT*

Dr. George Liang and Dr. Peter Lee were faculty members and physicians at Northwestern. Both men were also principal investigators for research trials conducted in OCRT. Drs. Liang and Lee were never supervised by Dr. Thomas Schnitzer, Sheri Lindsay, or Carol Nielsen. Each OCRT research trial is financially supported by grant money from an industry sponsor. Usually, the total amount of grant money exceeds the costs that OCRT and its clinic incur in conducting the clinical trial; any excess grant money is then allocated to the principal investigator and is referred to as a "physician recovery." Nielsen is responsible for reviewing and approving a budget for each clinical trial conducted in OCRT, which includes the amount of "physician recovery," if any. Nielsen bases her decision about the amount of physician recovery to allow on a variety of factors, including study cost and revenue. The recoveries typically range between eight and twenty percent of the total budget; Nielsen tries not to let a physician recovery go below 10%. Nielsen never considers the identity fo the principal investigator in determining the amount of physician recovery to allow in a particularly clinical trial budget. Nielsen never received any complaint from Dr. Lee or Dr. Liang regarding the amount of the physician recovery set for any clinical trials that either doctor conducted at OCRT.

*Temporary Employees at OCRT*

Michelle Tran was a temporary employee at OCRT. Tran reported to John Sikora and Dr. Thomas Schnitzer. Dr. Schnitzer thought very highly of Tran's work. When Tran was hired, she had just finished maternity leave and was looking for part-time flexible work hours. She worked a flexible schedule at OCRT. Tran wanted to become a permanent employee once her child got

older. Her supervisors and other OCRT managers discussed making Tran a permanent employee and were positive about the possibility of doing so. Tran never applied for a permanent position. In fact, Tran left her temporary position at Northwestern because her child developed an illness, and she needed to spend more time on her child's care.

Keerana Swastikul was employed by Northwestern in the Office of Sponsored Research Programs ("OSRP") on the Evanston campus, from approximately 1990 until 1996. OSRP is a separate department from OCRT, where Chen worked, although both are under the Office of the Vice President of Research. During this time, Swastikul reported to Barbara Siegel, the head of OSRP. She then worked in the OSRP office on the Chicago campus from approximately 1996 until the end of April 2000, during which time she reported to a number of supervisors. At no time did Swastikul report to Carol Nielsen or Sheri Lindsay.

Swastikul is a native of Thailand and English is her second language. Swastikul experiences some difficulties writing in English. In 2000, Pamela Webb, one of Swastikul's supervisors in Chicago, told Swastikul that her English was not good enough and that she needed to practice her English. Another of Swastikul's supervisors, Sara Judd, frequently called Swastikul in to complain about Swastikul's written English skills.

In 1996, Swastikul complained to Northwestern's affirmative action officer, Andy Neukranz-Butler, about certain racially-motivated comments that Swastikul claimed various Northwestern employees in OSRP directed at her while she worked on the Evanston campus. Swastikul never complained to anyone at Northwestern about discrimination after she moved to the Chicago campus in 1996.

Sheri Lindsay hired Lauro Sansano as a temporary employee in OCRT in May 2000. Lindsay completed a Personal Data form indicating that Sansano was hired as a temporary employee, which Sansano signed in Lindsay's presence on May 15, 2000. Sansano worked as a temporary employee in OCRT from May 2000 until December 2000. While he was employed in OCRT, Sansano completed and signed time sheets every two weeks that were entitled "Temporary Employee Time Sheet"; Lindsay also signed these time sheets on numerous occasions to approve Sansano's pay. Temporary employees at Northwestern may only work for 1,000 hours in a calendar year. When Sansano had worked 1,000 hours, his employment at Northwestern ended. Sansano never complained to Matt Bowers in HR about anything relating to his employment.

### Other Employees' Promotion and Job Changes

Allison Johnson was hired as a Protocol Coordinator in OCRT in October 2000. In January 2002, Johnson was given additional responsibilities and was promoted to a Lead Coordinator position. Debbie Gibson began working as an employee in OCRT in February 1998. In 2001, Gibson worked as a Research Coordinator in OCRT. In January 2002, Gibson was moved to a new position as a Regulatory Coordinator. Amy Lillard was hired by Northwestern in April 2001 as a Special Projects Coordinator I. She was promoted to Special Projects Coordinator II in September 2001. In June 2002, Lillard was transferred to a Regulatory Coordinator position that had been vacated by another employee.

### Chen's Discrimination Charges

On May 24, 2002, Chen filed a Charge of Discrimination (No. 210A203237) with the Equal Employment Opportunity Commission. In it, she alleged discrimination based upon race,

national origin, age, disability, and retaliation. On April 5, 2003, Chen received a Notice of Right to Sue for Chen's Charge No. 210A203237. Chen then filed her complaint in this lawsuit on June 5, 2003.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue of fact. Such a showing entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists only when a reasonable factfinder could find for the nonmoving party, based on the record as a whole. The court does not weigh the evidence and it does not make credibility determinations. Instead, the court makes all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). If a party fails to present proof on an essential element of his or her case, then all other facts become necessarily immaterial. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 509 (7th Cir. 1999).

## III.  ANALYSIS

Any discussion of Chen's claims must begin with a discussion of Chen's evidence. Chen is proceeding *pro se* in this matter and faces the significant evidentiary barriers common to *pro se* parties. In particular, Chen has submitted several volumes of exhibits to this Court, much of which has not been authenticated or verified by anyone with personal knowledge of the information contained therein. In addition, Chen has attached exhibits to several of the deposition transcripts submitted, and a closer look at the deposition transcripts reveals that

several of these exhibits are not properly submitted, were not produced during discovery, and remain unauthenticated. Although this Court construes all evidence in the light most favorable to the nonmovant when deciding a summary judgment motion, this Court cannot consider material that is not properly before it. Even taking into consideration Chen's *pro se* status, this Court will not consider documents whose veracity cannot be determined.

### A.  Discrimination Claims

Under the ADEA, Title VII, or § 1981, a plaintiff may prove her employment discrimination claim using either the "direct method" or the "indirect method." *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060, 1061 n.4 (7th Cir. 2003). Under the direct method, the plaintiff can use either direct or circumstantial evidence to show that her employer's decision to take an adverse employment action against her was motivated by an impermissible bias, such as race, age, or national origin. *Id.* at 1061. Direct evidence is evidence that, without relying on inference or presumption, proves that the employer discriminated against the plaintiff; the trier of fact must find such direct evidence believable. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). As such, courts have described direct evidence as essentially "an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (citation omitted). The plaintiff may also prevail under the direct method of proof by weaving a net of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Id.*; *see also Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Such a net of circumstantial evidence, however, must point "directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

The indirect method of proof is the familiar burden-shifting approach from *McDonnell-Douglas*, where plaintiff establishes her prima facie case of discrimination, defendant rebuts it, and plaintiff demonstrates that defendant's rebuttal is a mere pretext for discrimination. *Cerutti*, 349 F.3d at 1062. A plaintiff proceeding under this method must establish that (1) she is a member of a protected class (e.g., race, national origin, age); (2) she was qualified for the position (or to be retained, promoted, or rehired); (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably by their employer. *Id.*

No matter how the plaintiff chooses to proceed, the burden remains on the plaintiff to demonstrate that the employer would not have taken the alleged adverse employment action against the plaintiff but for plaintiff's membership in a protected class. *Cerutti*, 349 F.3d at 1062.

### 1. Certain of Chen's Allegations Are Time-Barred

Before the merits of Chen's claims can be addressed, the Court must determine whether any of her allegations are time-barred. Under Title VII of the Civil Rights Act of 1964, a plaintiff must file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") or the Illinois Human Rights Commission within 300 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (discussing charge filing requirements of Title VII). When the act complained of is a discrete retaliatory or discriminatory act, "it 'occurred' on the day it 'happened'." *Morgan*, 536 U.S. at 110. The 300-day period begins to run on the day the act occurred. Acts that occurred outside the limitations period, e.g., that occurred more than 300 days prior to the triggering act, must be connected to the events that occurred within the

limitations period. Id. at 118. A significant time lapse between the acts within the limitations period and those outside it may bar Plaintiff from seeking recovery for or relying on the acts that occurred outside the statutory period. *See Garrison v. Burke*, 165 F.3d 565, 570 (7th Cir. 1999) (quoted in *Boebel v. Combined Ins. Co. of Am.*, No. 02 C 1772, 2004 WL 144135, at *3 (N.D. Ill. Jan. 16, 2004)).

There are three considerations a court may use to determine whether a continuing violation exists: (1) the relatedness of the subject matter of the alleged acts or conduct; (2) the frequency of the acts or conduct complained of; and (3) their degree of permanence. *See Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992). Chen's complaint alleges wrongful termination, failure to promote, failure to reasonably accommodate her disability and failure to hire. With the exception of the failure to reasonably accommodate, these are all discrete acts and isolated acts. The failure to accommodate claim fails continuing violation analysis because Chen fails to provide sufficient evidence that Northwestern's denials of her accommodation requests were frequent or related. Therefore, any actions that occurred before July 28, 2001 (that date minus 300 days) are outside of the 300-day limit and no longer susceptible to judicial review. *See* 42 U.S.C. § 2000e-5(e); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 720-21 (7th Cir. 2004).

### 2. Wrongful Termination

#### a. Direct Method

Chen alleges that she was wrongfully terminated. Chen has adduced no direct evidence of discriminatory animus in her termination. She appears to seek to provide circumstantial evidence to create an inference that Northwestern had a discriminatory intent when it terminated her. To succeed, Chen must produce enough evidence to permit a reasonable finder of fact to infer that

Northwestern was motivated by Chen's race, national origin, age, or disability (actual or perceived) when it terminated her. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 983-39 (7th Cir. 2003). Chen would have to offer evidence showing that the person who decided to eliminate her position and terminate her, Schnitzer, was motivated by one of the discriminatory reasons she claims when he made that decision. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997). Northwestern asserts that Chen does not offer any evidence of this nature because none exists. Chen attempts to prove discriminatory intent by pointing to a series of comments and decisions undertaken by people at OCRT, Northwestern HR, and other departments.[6] Chen fails to show how the decisions and incidents involving other people demonstrate that *Schnitzer* was motivated by impermissible discriminatory animus. In fact, in her discussion of the experience of certain other Asian-Pacific employees, she discusses someone who worked in a different department, was supervised by difference people, and had no experience with Schnitzer, the person who decided to terminate Chen. As such, Chen fails to adduce direct proof of discriminatory intent in her wrongful discharge claim.

### b. Indirect Method

Chen asserts that she can make her prima facie case of discrimination through indirect evidence. She points to the United States Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), as support for her position. *Desert Palace* holds that a plaintiff is not required to present direct evidence of discrimination under Title VII in order to obtain a mixed-motive jury instruction. *Id*. at 92. *Desert Palace* does not, however, alter the requirement that a

---

[6] Northwestern notes, correctly, that the assertions Chen makes about discriminatory conduct by other employees at Northwestern are largely unsupported. Moreover, Northwestern notes that Chen's brief does not cite to evidence or law tending to support her assertions.

plaintiff provide *some* evidence of a discriminatory motive. *Id.* at 99-100. *Desert Palace* is unhelpful here, because Chen is unable to produce evidence to support a prima facie claim.

Chen argues that she is a member of a protected class as a woman of Asian-Pacific origin who was forty-four years old when she was hired. Pl.'s Resp. Br. at 11. She asserts that she was qualified for the position because she has a doctoral degree and "long-term teaching and working experience in the area." Pl.'s Resp. Br. at 13. Chen states that she suffered an adverse employment action when she was terminated in November 2001.

Northwestern does not dispute that Chen is a member of a protected class on the basis of national origin, race, and age. In addition, Northwestern does not dispute that Chen was qualified for the position of Technical Software Specialist, which both parties state was created especially for Chen. Pl.'s Compl., Attachment to Charge of Discrimination, at ¶ III.4 ("My position of Technical Software Specialist was created for me."); Def.'s L.R. 56.1 Stmt at ¶ 7 ("The Technical Software Specialist position was created especially for Chen."). Finally, Northwestern does not dispute that Chen was qualified for the TSS position.

Chen's prima facie case fails because she is unable to establish that she was treated differently from similarly situated employees who were not members of a protected class. To do this, she would have to provide evidence that there was an employee who was not a member of her race, age, or national origin class in a TSS or similar position who was treated differently from her. The uniqueness of Chen's position is particularly problematic in this regard. Both parties concede that the position was created especially for Chen. Northwestern asserts that the TSS position in OCRT has not existed since Chen was laid off. There is no evidence that there were other TSS positions or employees in comparable positions in OCRT at any time during

Chen's employment. Chen is unable to show that there were similarly situated employees who were not members of her protected class(es) and who were treated differently from her. Thus, her prima facie case fails. Summary judgment is therefore appropriate on Chen's wrongful termination claim.

### 3. Failure to Promote

Chen alleges that Northwestern discriminated against her by failing to promote her into the Research Financial Analyst position in OCRT in 2000 and 2001. Northwestern contends that Chen is time-barred from pursuing claims relating to events that occurred prior to July 28, 2001. Moreover, Northwestern contends that Chen never applied for the position. Chen asserts that she did not know that the Research Financial Analyst position was open. She asserts that Northwestern prevented her from knowing about the position opening, but the citation to the record she provides does not support her assertion. Furthermore, Chen acknowledges that she "never saw the job opening" announcement. Northwestern asserts that the position was posted on the university's job posting system all three times it became available and provided copies of the job requisition for all three openings.[7] Def.'s L.R. 56.1 Stmt at ¶ 154-55; Bowers Dep. Ex. G. In addition, Chen has failed to provide evidence showing that she was qualified for the Research Financial Analyst position. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (plaintiff must prove both that she applied for and that she was qualified for the position in

---

[7] Chen disputes that the position was posted on the university's job posting system and contends that the copies of the job requisition form show only that the position was filled each of the three times it was open. However, a closer inspection of the requisition form reveals that the form reports not only the date the position was filled or closed, but also the date the requisition was authorized. In each case, there is a difference of at least ten days between requisition and closing date. Bowers Dep., Ex. G.

question). Rather, Chen has provided a copy of her resume and asserted that, in her opinion, based on her advanced degree and her prior work experiences, she was qualified for the position. Even drawing all reasonable inferences in favor of the non-movant, this Court is unable to rely on unsubstantiated statements or assertions by a party to defeat a summary judgment motion. Thus, because Chen never applied for the Research Financial Analyst position, summary judgment for the defendant is appropriate on her failure to promote claim.

### 4.      Failure to Hire

A plaintiff alleging a failure to hire claim must establish that (1) she belongs to a protected group; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected, despite her qualifications; and (4) the employer hired someone outside the protected group. *Hughes v. Derwinski*, 967 F.2d 1168, 1171 (7th Cir. 1992). Chen fails to make her prima facie case, as discussed below.

### a.      The Research Financial Analyst Position

Chen also asserts that Northwestern failed to hire her into the Research Financial Analyst position in 2002. The difficulty with Chen's failure to hire claim is identical to her failure to promote claim, that is, she did not actually apply for the position in question.

### b.      Post-Layoff Job Applications

After her termination, Chen applied for five different positions at Northwestern in December 2001 and May 2002. Chen concedes that each application was processed according to Northwestern's practice and that she was not selected for any of the positions. None of the positions was in OCRT. None of Chen's former supervisors in OCRT was involved in the hiring decisions for these positions. Chen has provided no contrary evidence on any of these issues.

For these reasons, the defendant is entitled to summary judgment on Chen's failure to hire claim.

### 5.     Retaliation Claim

Chen alleges that Northwestern impermissibly retaliated against her in violation of Title VII, the ADEA, § 1981, and the ADA. Under these statutes, unlawful retaliation occurs when an employee suffers an adverse employment action because he or she opposed impermissible workplace discrimination. *Rogers v. City of Chicago*, 320 F.3d 748, 755 (7th Cir. 2003).

Northwestern argues that Chen's retaliation claim is improper because she did not raise it in her complaint and a "plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Garza v. City of Chicago*, No., 99 C 391, 2000 WL 283910, at *4 (N.D. Ill. Mar. 14, 2000). Northwestern further states that Chen did not include retaliation allegations in the five-page, single-spaced attachment to her complaint which made allegations about a litany of issues. This is not entirely accurate. Paragraph III.1 of Chen's attachment to her complaint sets forth allegations that clearly support a retaliation charge. Several other paragraphs also set forth allegations consistent with a retaliation claim, although in somewhat incoherent fashion. Moreover, Chen attached her EEOC right to sue letter and EEOC Charge of Discrimination to her complaint. On her Charge of Discrimination, she clearly checked the box for retaliation discrimination. As such, and bearing in mind Chen's *pro se* status, this Court will deny Northwestern's request to bar Chen's retaliation claim as improperly raised.

A plaintiff can prove retaliation discrimination using either the direct or the indirect methods described above. *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). A plaintiff may proceed under the direct method by adducing either direct or circumstantial evidence that permits a fact finder to infer discrimination. *Rogers*, 320 F.3d at 754. Circumstantial evidence can include suspicious timing, ambiguous statements, evidence that the employer treated similarly situated employees differently, or evidence that the employee was qualified but was subject to differential treatment for which the employer's reason is mere pretext. *Gorence v. Eagle Food Centers, Inc.*, 272 F.3d 759, 762 (7th Cir. 2001).

Chen puts forth no direct evidence of retaliation. She does, however, put forth some circumstantial evidence, namely the timing of her termination. Chen asserts that she was targeted for termination three months after she submitted an eight-page memo to Guy Miller, Associate Vice President of Human Resources, and Thomas Schnitzer, Director of OCRT, detailing that she "realized that [she] ha[d] been harassed and discriminated [against]." This memo purported to list the ways in which various OCRT supervisors and employees had discriminated against Chen; it was copied to seven people in OCRT and Northwestern HR. Chen asserts that the three month gap between her memo and her termination "provides ground" for her retaliation claim. The Seventh Circuit, however, has stated that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Chen presents no other circumstantial evidence as grounds for her retaliation claim. This Court finds that Chen presents no evidence to support the direct method of proving retaliation.

Chen can also proceed via the indirect method of proving retaliation. This method is similar to the *McDonnell-Douglas* burden-shifting approach, but has been clarified by the Seventh Circuit in *Stone v. City of Indianapolis Public Utilities Division*. 281 F.3d 640 (7th Cir. 2002). Under the indirect method articulated in *Stone*, Chen must establish a prima facie case of discrimination. One of the required elements of her prima facie case is that "only she, 'and not any otherwise similarly situated employee who did not complain, was ... subjected to an adverse employment action.'" *Rogers*, 320 F.3d at 755 (quoting *Stone*, 281 F.3d at 642)). Chen provides no discernible evidence of whether any other employee at OCRT complained of discriminatory treatment. However, even if she had, she fails to overcome Northwestern's legitimate, nondiscriminatory reason for its actions and therefore, fails to defeat summary judgment.

Assuming that Chen had been able to make out a prima facie case, the burden of production would shift to Northwestern to provide a legitimate, nondiscriminatory reason for terminating Chen. Northwestern states that Schnitzer eliminated three positions in OCRT as part of an effort to meet a requirement that he eliminate $200,000 from OCRT's budget when OCRT was moved into the Northwestern University Medical School. Dr. Robert Rosa, the Executive Associate Dean for Clinical Affairs of Northwestern's Medical School, wrote a letter to Schnitzer on October 26, 2001, stating "I am instructing you to decrease the projected expenses of the OCRT for budget year 2001-2002 by approximately $200,000." Rosa indicated that this budget decrease was "necessitated by the most recent estimates of projected revenues for the OCRT." To meet this mandate, Schnitzer and his management staff decided to eliminate three support-staff positions that were not directly providing services to principal investigators. These positions included the TSS position Chen held. Chen admits that Rosa directed Schnitzer to cut

OCRT's budget by $200,000. In addition, Chen is unable to produce evidence showing that Northwestern's budgetary constraint was mere pretext for discriminatory retaliation.

Because Chen is unable to rebut Northwestern's nondiscriminatory reason, summary judgment for the defendant on Chen's retaliation claim is appropriate.

### 6.      Failure to Reasonably Accommodate–ADA claim

Chen alleges that Northwestern discriminated against her on the basis of disability in May 2001 when it refused her request to work no more than two hours per day on her computer and keyboard; and again in November 2001, when it refused to allow her typing, copying, and computer work to only three hours per day in the Program Assistant 1 position and, instead, terminated her. Northwestern contends that Chen's first accommodation request is time-barred because it occurred prior to July 28, 2001; it further contends that her second accommodation request was unreasonable and that, in any event, it terminated her because of university budgetary constraints that necessitated eliminating her position.

The ADA prohibits certain employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2000). It is undisputed that Northwestern University is an employer subject to the ADA. It is less clear whether Chen is an "individual with a disability" for the purposes of the statute.[8] However, when deciding a summary judgment motion, this Court will make all

_____

[8] Chen has taken conflicting positions about whether she is an individual with a disability over the course of her employment with Northwestern and the pendency of this litigation. During her pre-termination communications with Northwestern's human resources and risk management

-30-

reasonable inferences in favor of the non-moving party. Therefore, this Court will treat Plaintiff as an individual with a disability for the purpose of deciding this motion.

To prove that she suffered disability discrimination under the ADA, Chen may use either the direct or the indirect method of proof. As with Title VII claims, there are two acceptable forms of evidence under the direct method: direct evidence and circumstantial evidence. Direct evidence is essentially an admission by the employer that its decisions were based on discriminatory animus. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence, by contrast, permits a fact-finder "to infer intentional discrimination by the decision-maker." *Id.*

Chen may also choose to proceed under the indirect method, which requires her to establish a prima facie case of discrimination. To make her prima facie case, Chen must show that (1) she was disabled under the ADA; (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) she has suffered from an adverse employment action because of her disability. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (citation omitted). If Chen establishes a prima facie case of disability discrimination, then the burden of production shifts to Northwestern to articulate a legitimate, nondiscriminatory reason for its adverse employment action against Chen. *Id.*; *Dvorak v. Mostardi Platt, Inc.*, 289 F.3d 479, 485 (7th Cir. 2002). At that point, the burden would shift back to Chen; she would be required to show by a preponderance of the evidence that Northwestern's proffered

---

personnel, Chen both requested accommodation of her disability under the ADA and denied that she was disabled and stated that her situation was not covered by the ADA. (Def.'s L.R. 56.1 Stmt, at ¶¶ 70, 76-84). Northwestern agreed that the ADA did not apply to Chen. (Def.'s L.R. 56.1 Stmt, at ¶ 79-80). However, Northwestern and Chen continued to discuss modified work assignments that would not aggravate her hand and wrist pain. (Def.'s L.R. 56.1 Stmt, at 83).

nondiscriminatory reason is a mere pretext for intentional disability discrimination. *Buie*, 366 F.3d at 503.

A plaintiff must show that she was qualified, with or without accommodation, to perform the essential functions of her job at the time that the employer took the allegedly discriminatory action. *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004); *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998). When determining what constitutes an essential job function, the court will consider "job description, employer's opinion, amount of time spent performing the function, consequences for not requiring the individual to perform the duty, and past and current work experiences." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 512-13 (7th Cir. 2001).

### a.  Direct Method of Proving Disability Discrimination

Chen has no direct evidence of disability discrimination. She must therefore proceed via circumstantial evidence or via the familiar *McDonnell-Douglas* burden-shifting method. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 101062 (7th Cir. 2003). Chen seeks to present circumstantial evidence of disability discrimination. Specifically, she provides three-and-a-half pages of numbered paragraphs which purport to demonstrate that a reasonable finder of fact could infer discriminatory intent from the university's actions. Much of the "evidence" presented in these pages of Chen's brief is questionable, unsubstantiated, or inadmissible hearsay. Moreover, Chen cites no legal authority for her assertion that this evidence constitutes sufficient circumstantial evidence to establish an inference of discrimination. The remainder address Chen's claims that she was unfairly disciplined, prevented from learning of job openings, or denied accommodation requests. Beyond the somewhat circular nature of some of these arguments, e.g., "I was not

accommodated because I was not accommodated," Chen's assertions have been contradicted by the record or are unsupported. Chen is unable to proceed under the direct method.

**b.        Indirect Method of Proving Disability Discrimination**

Chen must use the indirect, burden-shifting method to establish her prima facie case of disability discrimination. The elements of the prima facie case are identical to those discussed above. Chen is a member of a protected class on the basis of her age, race, and national origin. She further asserts that she is a member of a protected class on the basis of her disability, specifically carpal tunnel syndrome. As previously noted, this Court will treat Chen as disabled for the limited purpose of this summary judgment motion only. Chen asserts that she was qualified for the position because of her advanced educational achievement and extensive resume. Chen also asserts that she suffered adverse employment actions, including the elimination of her TSS position, Northwestern's refusal to accommodate her proposed restrictions on the Program Assistant 1 position, and her ultimate termination. The fourth element of her prima facie case is fatal to Chen's argument again, because Chen is unable to produce evidence establishing that she was treated differently from similarly situated employees who were not members of her protected class.

Northwestern contends that Chen was unable to perform the essential functions of her position, with or without reasonable accommodation. This is the question that this Court must answer in Chen's case. The factors that a court takes into consideration when determining what constitutes an essential job function include job description, employer's opinion, amount of time spent on the function in question, consequences of not requiring the employee to perform the function, and past and current work experiences. *Ammons v. Aramark Uniform Servs., Inc.*, 368

F.3d 809, 818 (7th Cir. 2004) (quoting *Emerson v. Northern States Power Co.*, 256 F.3d 506, 512-13 (7th Cir. 2001)).

### (1)    Chen's May 2001 Accommodation Request

Northwestern contends that this accommodation request is time-barred. Even if it was timely, Northwestern asserts that Chen's May 2001 request to limit her computer work to two hours per day was unreasonable; The TSS position, Northwestern asserts, was a "quintessential computer job." Def.'s Br. at 13. Moreover, Chen admits that she worked on her computer for up to 6-8 hours per day for months at a time.[9] Chen's job functions included the design, implementation, and maintenance of various databases; creation of materials and publications to promote OCRT within Northwestern University; provision of technical assistance and support to OCRT staff; and coordination of financial activities to enhance departmental reporting, all of which was largely done on the computer. The initial job description for the TSS position estimated that at least 30% of the position's duties would involve computer database work and another 30% would involve technical assistance to OCRT staff. Even taking a conservative view and assuming that only 30% of the position's duties involved computer work, the position still required over two-and-a-half hours of computer work per day. Between August and November 2000, Chen's supervisors in OCRT allowed her to perform non-computer tasks while they waited for her hands to improve. These alternate duties were not part of Chen's job duties;

---

[9] Chen asserts that she was able to perform her job functions because when she was not working on the computer, she was assisting colleagues in building databases. For evidentiary support, she cites a memo that she wrote to Michael Powell on March 10, 2001. This is insufficient because it is a self-serving statement contained in a document drafted by the plaintiff in this case. There is no evidence that any of Chen's supervisors agreed with Chen's interpretation of her job performance and ample evidence that they disagreed.

moreover, there was a limited supply of alternate duties in the office. Chen estimates that she performed zero hours of computer work per day from August 2, 2000 until April 26, 2001.

Northwestern asserts that Chen's accommodation request effectively required it to create a new job for Chen or make light duty work available indefinitely. The Seventh Circuit has stated that "a significant change in the essential functions of [plaintiff's] job" do not amount to a reasonable accommodation. *Ammons*, 368 F.3d at 819. Chen's suggested accommodations would amount to limiting her work to two hours out of an eight-hour work day. The other accommodation she suggested, that she sit with OCRT employees and help them build and maintain the databases they used without using a computer herself, would amount to using two employees' time to perform one employee's job function. These are not accommodations that would allow Chen to perform the essential functions of her position. "An employer is not obligated to change the essential functions of a job to accommodate an employee." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001). Chen's May 2001 accommodation request was unreasonable for the purposes of the ADA and therefore, Chen was not a "qualified individual" under the Act.

### (2)      Chen's November 2001 Accommodation Request

Chen alleges that Northwestern failed to reasonably accommodate her in November 2001, when it denied her request to take the Program Assistant 1 position on the condition that she perform no more than three hours of copying, typing, or similar tasks per day. Northwestern contends that Chen's condition rendered her unable to perform an essential function of the Program Assistant 1 position and that her proposed accommodation was unreasonable.

Northwestern asserts that the Program Assistant 1 position was primarily clerical and required a large amount of typing, copying, and other computer work. Working more than three hours per day on the computer was an essential function of the job, according to Northwestern. Chen disputes this assertion and argues that Northwestern updated the Program Assistant 1 position description before offering her the position as a "bump" option when the TSS position was terminated. The inference appears to be that Northwestern updated the position description in order to expressly disqualify Chen from being able to fill the position. Chen provides only her own inferences and asumptions to support this assertion, namely that Matt Bowers in HR emailed Schnitzer, stating that OCRT supervisors were updating position descriptions to be used in layoff letters. The supervisor who updated the Program Assistant 1 description stated in her deposition, however, that she did not know the updated description would be used in the layoff letters. This tends to undercut Chen's apparent argument that Northwestern deliberately updated the description in order to eliminate Chen. Another reasonable inference is that the job descriptions were revised to reflect Schnitzer's restructing plans for OCRT in response to the budget reduction mandate.

Courts do not second-guess an employer's judgment as to what constitutes an essential function of a job. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (citing *DePaoli v. Abbott Labs.,* 140 F.3d 668, 674 (7th Cir. 1998)). In addition, Chen's request that she be permitted to perform no more than three hours of copying, typing, and other computer tasks per day was not a reasonable accommodation. For these reasons, Chen was not "qualified" under the ADA because she could not perform the essential functions of the Program Assistant 1 position with or without a reasonable accommodation.

Summary judgment is appropriate for the defendant on Chen's failure to reasonably accommodate claims.

**Conclusion**

For the foregoing reasons, summary judgment is granted to the defendant on all of plaintiff's claims. All other motions are moot and terminated. This case is closed.

Enter:

/s/David H. Coar
_____
David H. Coar
United States District Judge

Dated: **February 17, 2005**